UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| ALOYSIUS DAVIS, individually and on | ) | |
| behalf of all others similarly situated, and | ) | |
| RHONDA BURNS, individually and on behalf | ) | |
| of all others similarly situated, | ) | Civil Action No. _____ |
| **Plaintiffs,** | ) | |
| | ) | **CLASS ACTION COMPLAINT** |
| v. | ) | |
| | ) | |
| BANK OF AMERICA, N.A.; | ) | |
| Bank of America, N.A. | ) | |
| as the Successor in Interest to | ) | |
| BAC HOME LOANS SERVICING, LP; | ) | <u>JURY TRIAL DEMANDED</u> |
| DISYS Corporation; and | ) | |
| ADECCO EMPLOYMENT SERVICES, | ) | |
| **Defendants.** | ) | |

## INTRODUCTION

1.      Plaintiffs, individually and on behalf of all other persons similarly situated, hereby allege the following upon personal knowledge as to themselves and upon information and belief as to all other matters based upon the investigation of their attorneys. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.    Additionally, Plaintiffs attach the August 8, 2013 Affidavit made by Recorda Simon, a former Adecco employee who worked as a "temp" at Bank of America's Fort Worth processing center, to support the allegations made herein.  This Action seeks the ultimate certification of the following class of Plaintiffs:

All Kansas residents who have or had mortgages serviced by one of the Defendants who were qualified to receive a HAMP modification of their mortgage, but who were:

i.      wrongfully denied the opportunity to apply for HAMP modification, or

ii.     wrongfully prevented from completing the HAMP modification process, or

iii.     wrongfully denied a permanent HAMP modification on their home mortgage as a
result of the acts described below, or as a result of similar wrongdoing on the part of
the Defendants as revealed by the discovery process.

## NATURE OF THE ACTION

2.      In October 2008, Bank of America accepted $15 billion in funds from the United
States Government as part of the Troubled Asset Relief Program (TARP), 12 U.S.C. § 5211. In
January 2009, in connection with its acquisition of Merrill Lynch, Bank of America accepted
another $ 10 billion in TARP funds along with a partial guarantee against losses on $118 billion
in mortgage-related assets. By accepting these payments, Bank of America agreed that it would
participate in one or more programs that TARP authorized the Secretary of the Treasury to
establish, and which the Secretary deemed necessary to minimize foreclosures.

3.      Consistent with the TARP mandate, the Treasury Department implemented the
Home  Affordable Modification Program (HAMP) – a detailed program designed to stem the
foreclosure crisis by providing affordable mortgage loan modifications and other alternatives to
foreclosure, to eligible borrowers. Companies that accepted money under TARP are subject to
mandatory inclusion in HAMP as are certain classes of loans, namely those held by Federal
National Mortgage Association (Fannie Mae) and Federal Home Loan Mortgage Corporation
(Freddie Mac).

4.      Bank of America signed a contract with the U.S. Treasury on April 17, 2009
agreeing to comply with the HAMP requirements and to perform loan modification and other
foreclosure prevention services described in the program guidelines. The guidelines issued by the
Treasury Department set forth a detailed process whereby a participating servicer such as Bank
of America, acting through its subsidiary BAC Home Loans Servicing, must:

- Identify loans that are subject to modification under the HAMP program, both through its own review and in response to requests for modification from individual homeowners;

- Collect financial and other personal information from the homeowners to evaluate whether the homeowner is eligible for a loan modification under HAMP;

- Institute a modified loan with a reduced payment amount as per a mandated formula, that is effective for a three-month trial period for borrowers that are eligible for a modification; and

- Provide a permanently modified loan to those homeowners who comply with the requirements during the trial period.

- In addition, whether the homeowner qualifies for a modification or not, participating servicers are also required to provide written notices to every mortgage borrower that has been evaluated for a loan modification, advising whether or not the borrower has been found eligible.

5.  HAMP and its associated directives also set prohibitions against certain conduct including, but not limited to:  demanding upfront payments in order to be evaluated for a loan modification; instituting or continuing foreclosures while a borrower is being evaluated for a loan modification; and restrictions on the way a servicer may report the borrower to credit reporting agencies.

6.  Though Bank of America accepted $25 billion in TARP funds and entered into a contract obligating itself to comply with the HAMP directives and to extend loan modifications for the benefit of distressed homeowners, Bank of America has systematically failed to comply

3

with the terms of the HAMP directive and has regularly and repeatedly violated several of its prohibitions.

7. Under HAMP, the federal government incentivized participating servicers to make adjustments to existing mortgage obligations in order to make the monthly payments more affordable. Servicers receive $1,000 for each HAMP modification. However, this incentive is countered by a number of financial factors that make it more profitable for a mortgage servicer such as Bank of America to avoid modification and to continue to keep a mortgage in a state of default or distress and to push loans toward foreclosure. This is especially true in cases where the mortgage is owned by a third-party investor and is merely serviced by the servicer such as Bank of America. On information and belief, Bank of America services more loans than it owns.

8. Economic factors that discourage Bank of America from meeting its contractual obligations under HAMP by facilitating loan modifications include the following:

- Bank of America is required to repurchase loans from the investor in order to permanently modify the loan. This presents a substantial cost and loss of revenue that can be avoided by keeping the loan in a state of temporary modification or lingering default.

- The monthly service fee that Bank of America, as the servicer collects for each loan it services in a pool of loans, is calculated as a fixed percentage of the unpaid principal balance of the loans in the pool. Consequently, modifying a loan to reduce the principal balance results in a lower monthly fee to the servicer.

- Fees that Bank of America charges borrowers that are in default constitute a significant source of revenue to the servicer. Aside from the income Bank of America directly receives, late fees and process management fees are often added to the

4

principal loan amount thereby increasing the unpaid balance in a pool of loans and increasing the amount of the servicer's monthly service fee.

- Entering into a permanent modification will often delay a servicer's ability to recover advances it is required to make to investors of the unpaid principal and interest payment of a non-performing loan. The servicer's right to recover expenses from an investor in a loan modification, rather than a foreclosure, in often less clear and less generous.

- Fixed overhead costs involved in successfully performing loan modifications involve up-front cost to the servicer for additional staffing, physical infrastructure, and expenses such as property valuation, credit reports, and financing costs.

9.    Rather than allocating adequate resources and working diligently to reduce the number of loans in danger of default by establishing permanent modifications, Bank of America has serially strung out, delayed, and otherwise hindered the modification processes that it contractually undertook to facilitate when it accepted $25 billion dollars from the United States. Bank of America's delay and obstruction tactics have taken various forms with the common result that homeowners, like Plaintiffs, with loans serviced by Bank of America, who are eligible for permanent loan modifications, and who may have met the requirements for participation in the HAMP program, have not received permanent loan modifications to which they are entitled.

10.    In addition to its obligations based on its contract with the Treasury Department, Bank of America has entered into written agreements with individual homeowners, including Plaintiff Davis, for temporary loan modifications that must be converted to permanent loan modifications. Plaintiff Davis and a similar class of borrowers have complied with the agreements by submitting the documentation asked of them and, when requested, by making

5

payments. Despite Plaintiff's efforts, Defendant repeatedly ignored its contractual obligation to modify his loan permanently.

11. Because Bank of America is not and has not been meeting its contractual obligations, at least hundreds of Kansas homeowners, if not thousands, are wrongfully being deprived of an opportunity to cure their delinquencies, pay their mortgage loans and save their homes and their credit records. By failing to live up to its obligations under the terms of the agreement it entered into with the Department of the Treasury, and the terms of the contracts its formed with individual homeowners, Bank of America has left thousands of borrowers in a state of chaos – often worse off than they were before they sought a modification from Bank of America. Defendants' actions violate contractual obligations, frustrate the purpose of HAMP, disrupt families, cause instability in marriages, cause job josses, and are illegal under Kansas and federal law.

12. In April 2011, the Comptroller of the Currency of the United States Treasury Department issued a 32 page "Cease and Desist Order" against Bank of America, detailing its widespread systemic failures in its mortgage payment processing and foreclosure handling processes and procedures, ordering it to overhaul virtually every dimension of its mortgage and foreclosure activities/practices because same were resulting in "unsafe and unsound practices by Bank of America," and causing financial injuries to consumers. A copy of said "Cease and Desist Order" is attached hereto as Exhibit B, and some of the categories of failures include: failing to hire qualified persons to handle mortgage and foreclosure processing, failing to adequately train said workers, failing to supervise said processors, failing to adequately train supervisors, lack of adequate supervision for the supervisors (and on up the line), absence of a compliance system to ensure employees and operations comply with state and federal regulations

6

of mortgage processing, absence of checks and balances in systems and personnel, lack of dependable information management systems such that records of borrower's mortgage accounts and mortgage information are rife with errors, absence of dependable auditing, lack of "independent judgment and respect" for auditors and compliance personnel, and more.

13.     At approximately this same time, the Treasury Department ordered Bank of America to appoint a "single point of contact" for each mortgage/borrower who was in default (and seeking modification) so that borrowers could begin to get dependable assistance and reliable information about their mortgages. However, Bank of America failed to establish such a system, or has only recently adopted such a system, thereby perpetuating chaos and confusion for borrowers throughout the modification process as described herein.

14.     At the time it issued the Cease and Desist Order, the Treasury Department also ordered Bank of America to account monthly and quarterly on its "progress" in correcting the massive problems detailed in the Cease and Desist Order, and to obtain the Treasury Department's approval for its "progress." The Treasury Department also ordered Bank of America to allocate a very substantial amount of capital for exclusive use in overhauling its mortgage processes and personnel, with said amount approved by the Treasury Department.

15.     Despite the issuance of the Cease and Desist Order against it by the U.S. Treasury Department through the Comptroller of the Currency in April, 2011, Bank of America has made very little, if any, change or improvement in its processes, procedures, hiring practices, training practices, and personnel, thereby perpetuating massive mortgage modification and payment processing fraud, deception, and failures upon its borrowers, who have been personally and financially aggrieved by stress, losing their homes, fear of losing their homes, instability in marriages, interference with work performance, and even loss of jobs.

16. Plaintiff Aloysius De Mon Davis and Plaintiff Rhonda Burns bring this suit on behalf of each of themselves and a Class of similarly situated Kansas residents to challenge the failure of Defendant Bank of America, N.A. and its subsidiary BAC Home Loans Servicing, LP (collectively referred to as Defendants or Bank of America) to honor the terms of their agreement with the United States Treasury for the intended benefit of homeowners, their failure to honor agreements directly with individual homeowners to modify mortgages to a point that they are affordable and sustainable, their violations of the Fair Debt Collections Act and Fair Credit Reporting Act and to recover costs and losses incurred as a result of all of the foregoing.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction over this action under 28 U.S.C. §1332(d)(2) in that the matter is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and members of the Class are citizens of a State different from the Defendants.

18. This Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331 insofar as it concerns civil claims arising under laws of the United States, namely 18 U.S.C. §§ 1341, 1343, as well as the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968.

19. This Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 1367 in that Plaintiff and the members of the Class are intended third-party beneficiaries to a contract between Bank of America and the U.S. Treasury that was entered into pursuant to and under the direction of TARP. 12 U.S.C. § 5201 et seq.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) inasmuch as the unlawful practices are alleged to have been committed in this District, each of Defendants regularly conduct business in this District, and the named Plaintiff resides in this District.

## PARTIES

21.     Plaintiff Aloysius Davis is an individual residing in Kansas City, Kansas. Plaintiff, as detailed below, was forced to apply three separate times for a HAMP modification, and he qualified for a HAMP loan modification but, due to Defendants' misconduct, was been denied a HAMP loan modification all three times. Instead, Plaintiff was placed in a private Bank of America loan modification at the whopping interest rate of 11.9 percent (whereas HAMP would have given him 3 percent), and has suffered extreme and widespread damages as a result of Bank of America's misconduct.

Plaintiff Rhonda Burns is a Kansas resident who was falsely denied the opportunity of obtaining a HAMP modification through fraudulent statements made by a Bank of America agent, even though she was qualified to receive same if she complied with the application and approval process.

22.     Defendant Bank of America, N.A. is a Delaware corporation with its principle place of business in Charlotte, NC.

23.     Defendant BAC Home Loans Servicing, LP ("BAC"), formerly doing business as Countrywide Home Loans Servicing, LP ("Countrywide"), was a Texas limited partnership with its principle place of business located in Calabasas, CA. BAC was a subsidiary of Bank of America, N.A. until July 1, 2011, when it was merged into Bank of America, N.A., and the two Defendants are hereafter collectively referred to as "Bank of America." Bank of America currently does business and maintains branch offices throughout the State of Kansas.

9

24. Defendant Disys Corporation (hereafter "Disys") is a Maryland corporation with offices in this District and with offices in the Dallas-Fort Worth, Texas area in which conducted activities pertinent to the allegations made herein. Disys sells itself as a global IT (information technology) staffing firm which frequently serves Fortune 500 companies.

25. Adecco Employment Services (hereafter "Adecco") has several offices in this District, but strangely, the Kansas Secretary of State's website shows that its Certificate to do business in Kansas has been forfeited. Adecco operates nationwide, and has many offices in Dallas-Fort Worth area which engaged in activities pertinent to the allegations herein. Adecco engages, in part, in IT staffing nationwide.

26. This Court has personal jurisdiction over the parties in this action by the fact that each of Defendants are/were corporations and/or entities that are/were licensed to do business in the State of Kansas and/or otherwise conduct business in the State of Kansas.

## FACTUAL BACKGROUND

### A. The Foreclosure Crisis

27. Over the last five years, the United States has been in a foreclosure crisis. A congressional oversight panel noted that in 2011 one in eight U.S. mortgages was in foreclosure or default, and the numbers have steadily increased since. The Wichita Eagle reported in June 2013 that since the financial crisis began in September 2008, about 4.5 million homes nationwide have gone through foreclosure.

28. When RealtyTrac, the leading online marketplace for foreclosure properties, filed its Year-End 2010 U.S. Foreclosure Market Report, which showed a total of 3,825,637 foreclosure filings – default notices, scheduled auctions and bank repossessions – were reported on a record 2,871,891 U.S. properties in 2010, an increase of nearly 2 percent from 2009 and an

10

increase of 23 percent from 2008. The report also shows that 2.23 percent of all U.S. housing units (one in 45) received at least one foreclosure filing during the year, up from 2.21 percent in2009, 1.84 percent in 2008, 1.03 percent in 2007 and 0.58 percent in 2006. RealtyTrac's Year-End 2012 U.S. Foreclosure Market Report showed a total of 2,304,941 foreclosure filings reported on 1,836,634 U.S. properties in 2012.

29.     Kansas, like other states in the country, has been hard hit by the housing crisis with epidemic level foreclosures in the years 2008 through 2011, and while rates have declines in the past year or so, there are still hundreds and thousands more foreclosures looming for filing in Kansas, according to multiple industry experts.

**B.     Creation of the Home Affordable Modification Program.**

30.     Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together the "Act"). 12 U.S.C.A. §201 et seq. (2009).

31.     The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system and ensure that such authority is used in a manner that protects home values and preserves homeownership. Id.

32.     The Act grants the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program, or TARP. 12 U.S.C. § 5211. Under TARP the Secretary may purchase or make commitments to purchase troubled assets from financial institutions. Id.

33.     Congress allocated up to $700 billion to the United States Department of Treasury for TARP. 12 U.S.C. §5225.

11

34.    In exercising its authority to administer TARP, the Act mandates that the Secretary "shall take into consideration the need to help families keep their homes and to stabilize communities." 12 U.S.C. § 5213(3).

35.    The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures." 12 U.S.C. § 5219. The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." Id.

36.    The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures. 12 U.S.C. § 5220.

37.    On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary of the Director of the Federal Housing Finance Agency announced the Making Home Affordable program.

38.    The Making Home Affordable program consists of two subprograms. The first sub-program relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable Refinance Program or HARP.

39.    The second sub-program relates to the creation and implementation of a uniform loan modification protocol, and is now known as the Home Affordable Modification Program, or HAMP.

12

40. HAMP is funded by the federal government, primarily with TARP funds. The Treasury Department has allocated at least \$75 billion to HAMP, of which at least \$50 billion is TARP money.

## C. Duties of a Participating Servicer Under HAMP.

41. Because Bank of America accepted \$25 billion in federal funds and additional loan guarantees, it was required to participate in HAMP for the loans on which it functions as a loan "servicer." In that regard, on April 17, 2009, Steve R. Bailey, of Bank of America, N.A., executed a Servicers Participation Agreement ("SPA") with the federal government.

42. The SPA executed by Mr. Bailey incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins frequently asked questions, letters, directives, or other communication," referred to as "Supplemental Directives," issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers. These documents together are known as the "Program Documentation (SPA I.A.)," and are incorporated by reference herein. The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services."

43. The first Supplemental Directive ("SD") was issued on April 6, 2009 and states that the national mortgage modification program was "aimed at helping 3 to 4 million at-risk homeowners – both those who are in default and those who are at imminent risk of default – by reducing monthly payments to sustainable levels." This directive and the directives to follow were issued to provide guidance for adoption and implemental of HAMP "to provide a borrower with sustainable monthly payments."

13

44. The Program Documentation requires Participating Servicers to evaluate all loans which are 60 or more days delinquent or appear to be in imminent default (as defined by the Program Documentation), to determine which loans meet the HAMP eligibility criteria. In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if the borrower is eligible for HAMP modification.

45. A HAMP Modification consists of two stages. First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan ("TPP"). Second, upon successful completion of the TPP, the Servicer must offer the homeowner a permanent modification.

46. A mortgage is eligible for the HAMP if criteria enumerated in the Program Documentation are met. Aside from criteria that require that the loan be a first lien mortgage originated before 2009, that the property be occupied, and that it be the borrower's principal residence, the most salient conditions are (i) that the loan is delinquent or default is reasonably foreseeable; (ii) that the borrower documents a financial hardship (as defined in the Program Documentation); and (iii) that the "borrower has a monthly mortgage payment ratio of greater than 31 percent" of the borrower's monthly income.

47. The servicer must "provide a borrower with clear and understandable written information about the material terms, costs, and risks of the modified mortgage loan in a timely manner to enable borrowers to make informed decisions."

48. Once the participating servicer has determined a mortgage borrower's eligibility for the HAMP, the servicer must apply the modification steps enumerated in the Program Documentation, in the stated order of succession until the borrower's monthly mortgage payment

14

ratio is reduced to 31 percent of the borrower's monthly income.       These steps include capitalizing accrued interest and escrow advances, reducing the interest rate, extending the term and re-amortizing the loan (if necessary), and providing a principal forbearance (if necessary).

49.     After applying the enumerated modification steps to calculate the modified payment amount, a servicer must offer the qualifying borrower a TPP. The TPP consists of a three-month period in which the homeowner makes mortgage payments based on the modification formula stated in the Program Documentation. Bank of America uses a standard form agreement to offer TPPs to eligible homeowners. This agreement describes the homeowner's duties and obligations under the plan and promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements.

50.     If the homeowner executes the TPP Agreement, complies with all documentation requirements and makes all three TPP monthly payments, the second stage of the HAMP process is triggered, in which the homeowner must be offered a permanent modification. The payment amount and interest rate in the modified loan are fixed for five years and equal to the payment amount and interest rate in the TPP. Thereafter, the rate may increase annually by up to one percent until it reaches an interest cap which is the lesser of: (i) the fully indexed and fully amortizing contract rate; or (ii) the Freddie Mac Primary Mortgage market Survey rate for 30-year fixed rate mortgage loans on the date the modification is prepared. Once capped, the rate is fixed for the remainder of the term.

51.     HAMP prohibits a participating servicer from taking several actions including the following:

- Proceeding with a foreclosure sale. Any foreclosure sale must be suspended and no new foreclosure action may be initiated during the trial period, and until the borrower has been considered and found ineligible for other available foreclosure prevention options;

- Requiring a borrower to make an initial contribution payment pending the processing of the trial period plan before the plan starts;

- Soliciting borrowers to opt out of consideration for HAMP during the temporary review period;

- Reporting borrowers as delinquent to credit reporting bureaus without explanation. For borrowers who are current when they enter a trial period, the servicer should report the borrower current but on modified payment if the borrower makes timely payments during the trial period. For borrowers who are delinquent when they enter the trail period, the servicer should report in such a manner that accurately reflects the borrower's current workout status;

- Assessing prepayment penalties for full or partial prepayment as part of the modification.

52.     The HAMP requires a participating servicer to send a Borrower Notice to every borrower that has been evaluated for HAMP but is not offered a Trial Period Plan, is not offered a permanent HAMP modification, or is at risk of losing eligibility for HAMP because they have failed to provide required financial documentation.

53.     The HAMP presumes that final modifications will be extended and finalized upon completion of a TPP or shortly thereafter.

16

54.     HAMP Supplemental Documentation dated December 22, 2009 addresses situations in which the borrower has completed the TPP but has not yet received a permanent modification. In situations where an eligible borrower successfully completed the trial period and should have been converted to a permanent modification, but for reasons beyond their control were not timely evaluated for a permanent modification, the servicer must promptly make a determination as to whether the borrower is eligible for a permanent HAMP modification. If the borrower is eligible, then the servicer must offer the borrower a permanent HAMP modification as soon as possible, but in no event later than sixty days after discovering the error.

55.     By entering into the SPA, Bank of America covenanted that all services will be performed in compliance with all applicable Federal, state and local laws, specifically including state laws designed to prevent unfair, discriminatory or predatory lending practices.

56.     Under the SPA, Bank of America also covenanted that it would perform the services required under the Program Documentation and the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well-managed operation, and no less than which Bank of America exercises for itself under similar circumstances, and that Bank of America would use qualified individuals with suitable training, education, experience and skills to perform the Services.

57.     Bank of America has routinely failed to meet its obligations under the SPA and the Program Directives. Mortgage borrowers who request to be evaluated for a modification under HAMP routinely face unexplained delays and go weeks or months with no communication form Bank of America after providing the requested information. Borrowers who attempt to contact Bank of America by telephone face long periods of time on hold and are transferred

17

between service representatives in a deliberate effort to cause the borrower to give up and terminate the call. Bank of America regularly falsely informs borrowers that it did not receive requested information and demands that documents be re-sent.

58.    Bank of America has routinely failed to live up to its end of the TPP Agreement and offer permanent modifications to homeowners. In January 2010, the U.S. Treasury reported that Bank of America had 1,066,025 HAMP-eligible loans in its portfolio. Trial periods have been started on only 237,766 of these loans. Of those, just 12,761 resulted in permanent modifications (only 5% of the started Trial modifications and just over 1% of the eligible pool) even though many more homeowners had made all payments and submitted all documentation required by the TPP Agreement.

59.    The balance of 2010 showed little improvement. Through December 31, 2010, Treasury Department data revealed that Bank of America had started a total of approximately 352,869 TPPs.    Of those started, only 90,243 had resulted in permanent modifications (approximately 25.5% of those which started, and approximately 8.5% of the eligible pool). Another 12,783 homeowners were still in TPP which had already exceeded three months.

60.    Bank of America is not complying with HAMP in a manner that can only be considered deliberate and purposeful on the part of Bank of America. Bank of America's general practice and culture is to string homeowners along with no intention of providing actual and permanent modifications. Instead, Bank of America has put processes in place that are designed to foster delay, mislead homeowners, avoid modifying mortgage loans, increase Bank revenue at the expense of not only the individual homeowners involved, but the federal government and all American tax payers as well, who end up footing the bill and lining the Bank's wallet.

18

61.     Bank of America commonly uses a delay tactic of encouraging or even requiring homeowners to resubmit financial information each time the customer calls in to inquire about a pending modification. Any change in financial information – even a small change – then causes Bank of America to restart the application process under the pretext of changed factual information.

62.     Bank of America customer service representatives mislead homeowners who call to inquire about loan modifications for which they have applied. Bank of America customer service representatives regularly inform homeowners that modification documents were not received on time or not received at all when, in fact, all documents have been received. Similarly, homeowners are regularly told that documents were sent on a particular date when, in fact, they had not been sent at all.

63.     Bank of America regularly ignores completed loan modifications by not properly reflecting the modification in its computer system. Bank of America continues to treat the loan as delinquent by sending delinquency notices, reporting homeowners as delinquent to credit reporting agencies, and by instituting foreclosure proceedings, violating HAMP, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, multiple state statutes, multiple common law violations, and common sense of decency (the tort of "intentional infliction of emotional distress" in Kansas). By delaying notifications to some homeowners that they were granted modifications, Bank of America continued to collect higher mortgage payments than it would have received if the homeowners were aware that the modifications had been granted.

64.     Bank of America regularly fails to properly credit payments made by homeowners under a Trial Payment Plan. Bank of America commonly applies payments to late fees or foreclosure fees and then deems a payment the homeowner made under a trial plan to be

19

insufficient. Bank of America's regular practice is to place payments a homeowner makes into a suspense account or "partial payment balance account" and not to credit the homeowner's regular mortgage account. This results in Bank of America improperly treating a homeowner who has made timely payments under a Trial Plan as delinquent.

65.     Bank of America does not employ the required "waterfall" method of calculating homeowners' payments and/or the reductions they are entitled to as modifications as mandated by HAMP. In addition, Bank of America has manipulated homeowners' financial records in its computer system to homeowners' detriment.

66.     Despite the HAMP directives regarding the specific manner in which homeowners in the process of applying for a modification or in a Trial Period Plan are to be reported to credit reporting agencies, Bank of America's practice is to report homeowners to credit reporting agencies as being delinquent without further explanation, thereby further damaging the homeowners' credit for months at a time.

67.     The vast majority of homeowners who seek a HAMP modification with Bank of America do not ever receive a permanently modified loan but are instead delayed indefinitely, to their loss and to the Bank's profit.

68.     By failing to live up to the TPP Agreement, failing to convert TPPs into permanent modifications and otherwise improperly handling consumer requests to modify home loans pursuant to HAMP, Bank of America is leaving homeowners in limbo, wondering if their homes can be saved, and preventing homeowners from pursuing other avenues of resolution, including using the money they are putting toward TPP payments to fund bankruptcy plans, relocation costs, short sales or other means of curing their default. This also results in stress to

marriages, instability in marriages, interference with job performance, and in some cases actual job loss as a result of pending modifications and/or foreclosures.

69.     Bank of America's actions are damaging, among other things, to the credit scores and other credit information of Plaintiff and the members of the Class, hurting Class members' ability to engage in other financial transactions because of negative marks on their credit reports, and in some cases causing actual job losses to customers' whose mortgage payments and/or modifications have been mishandled, delayed, or denied.

70.     The problems detailed above compose a purposeful scheme used by Bank of America to defraud American homeowners, the federal government, and taxpayers. Additional participants in this scheme are each of Disys and Adecco, as detailed below.

71.     "Disys" is a world-wide staffing firm with an office in the Dallas-Fort Worth area. Disys has one or more individuals in the Dallas office who, upon information and belief, work exclusively on placing "temp" (i.e., temporary) workers at the Bank of America processing center in Fort Worth. Upon information and belief, Disys has placed over 10,000 temp workers in the Bank of America payment processing center in Fort Worth in the past five years.

72.     "Adecco" is a nationwide staffing firm with an office in the Dallas-Fort Worth area. Adecco has one or more individuals in the Dallas office who, upon information and belief, work continuously on placing "temp" (i.e., temporary) workers at the Bank of America processing center in Fort Worth. These "workers" are employed and paid by Adecco, but temporarily assigned to work at the Bank of America foreclosure processing center in Fort Worth.

73.     Upon information and belief, Adecco has placed hundreds if not thousands of temp workers in the Bank of America payment processing center in Fort Worth in the past 5

21

years. As Adecco is – or should be – aware, this processing center processes mortgages for millions of mortgage holders across America.

74.     Upon information and belief, Disys and Adecco place their employees at the Fort Worth Bank of America center which they each know or should know are not qualified to process mortgages based on their educational and/or work experience. Disys and Adecco place their employees at the Bank of America's Fort Worth processing center without running criminal background checks on said persons to confirm that they have the honesty and/or integrity one would expect as a necessity for working in the mortgage processing industry.

75.     Upon information and belief, Disys and Adecco place their employees at Bank of America's Fort Worth processing center without qualifying them from a maturity standpoint which one would expect as a necessity for working in the mortgage processing industry. Disys and Adecco each place their employees at Bank of America's Fort Worth processing center without some type of drug screening, even as minimal as gathering visual clues, which one would expect as a necessity for working in the mortgage processing center.

76.     Upon information and belief, overall, Disys and Adecco place "temp" employees at Bank of America's Fort Worth processing centers which each company cannot help but know have either criminal backgrounds, drug problems, maturity problems, and/or a lack of education or work history qualifications for performing the work necessary for responsible mortgage processing operations.

77.     Due to intimate knowledge of the extent of unqualified workers and huge turnover in workers at the processing center, each of Disys and Adecco knew or should have known that Bank of America was using this staffing method as an intentional scheme to cover up and/or perpetuate systems of wrongdoing in mortgage processing. If each of Disys and Adecco did not

22

in fact know or suspect that Bank of America was covering up and/or perpetuating systems of wrongdoing, Disys and/or Adecco only lacked that knowledge because each was blinded by the profits it was reaping by virtue of this scheme. Further, Disys and/or Adecco is responsible for the acts of its employees, and it was said acts which Bank of America used to perpetuate its fraud on the American public.

78. Whether through direct knowledge or by turning a blind eye, Disys and/or Adecco were acting with conscious disregard for the ethics of their profession, and for the common standards of decency with which Americans deserve to be treated with regard to their home mortgages.

79. The vast majority of workers placed at Bank of America's processing center remained employees of Adecco throughout their (short) tenures at Bank of America's processing center. Only on rare occasions was an employee working at the Bank long enough to convert into an actual employee of Bank of America.

80. Through the actions described above, Dysis and/or Adecco were acting in concert with Bank of America in perpetuating a mortgage and foreclosure processing scheme under which American homeowners were being cheated and defrauded with respect to their mortgages, causing losses to said homeowners, and to American taxpayers who ultimately picked up the tab through federal home loan mortgage insurance.

**D. Plaintiff Davis' Effort to Obtain a Loan Modification Under HAMP**

81. Plaintiff Aloysius Davis purchased his home in 2005. He financed his home with a mortgage through Countrywide Bank FSB (now owned by Bank of America). The terms of the loan provided for a two year fixed rate mortgage with an interest rate of 11%. The mortgage loan required payments of $924 which did not include taxes, insurance, or Private Mortgage

Insurance payments. These payments were scheduled to last for a full thirty (30) years (Countrywide later contended it was a two year fixed, adjustable after that initial period).

82. The servicing of Mr. Davis' mortgage was transferred to, or otherwise assumed by, Defendant BAC Home Loans. Ownership of the notes remained with Bank of America.

83. Starting in 2005 and continuing through the summer of 2009, Mr. Davis made all of his mortgage payments. However, during that summer his back was injured while he was at work and he subsequently was unable to work due to the resulting disability.

84. Unable to work and concerned about his ability to make his mortgage payments, in October 2009 Mr. Davis contacted BAC Home Loans about a possible modification. In response, the Bank sent him a HAMP Modification packet.

85. In October or early November, 2009, Mr. Davis completed the Packet, complete with all requested documentation, for a HAMP modification and submitted it to Bank of America.

86. In December 2009, the Bank informed Mr. Davis that he had been denied a modification under HAMP and/or told him that he must reapply.

87. Thus, in or around January 2010, the Bank sent Mr. Davis a second HAMP modification packet.

88. Once again Mr. Davis completed the packet and submitted it, with all necessary documentation, to the Bank.

89. At some point during this approximate time period, Bank of America informed Mr. Davis to not make any more mortgage payments to it, because his loan had been sold to Bank of New York Mellon. Mr. Davis was told to wait to hear from New York Mellon before making any more payments.

24

90. Mr. Davis did not hear from New York Mellon over the subsequent weeks, and thus he went back to Bank of America and tried to make mortgage payments so that he would not be in default of his mortgage. However, Bank of America refused to accept his payments, telling him again that his mortgage had been purchased by New York Mellon.

91. After some months in limbo and unable to make his payment because he had no one to "make it to," Mr. Davis was once again contacted by Bank of America, and this time he was told that his loan was not with New York Mellon but that it was back with Bank of America itself.

92. Accordingly, in or around April 2011, Mr. Davis sought out and met with a "Carrie" at Bank of America's 75th and I-35 branch location in Overland Park, Kansas, and obtained and/or completed yet a third modification packet of documents. "Carrie" informed Mr. Davis that this time his modification should "go through," and he expected it to be approved in approximately August of that year.

93. Bank of America did not advise Mr. Davis that it had reported him to the national credit reporting agencies for not making his mortgage payments during the time the Bank would not allow him to make payments because it allegedly had transferred the mortgage to New York Mellon.

94. In or around October 2011 Mr. Davis was informed that he had received a modification under which he was to submit three monthly trial payments, and that if he did so successfully, he would be given a permanent modification.

95. Accordingly, in each of October, November, and December, 2011 Mr. Davis made the trial payments as instructed. And, as promised, at the end of the time period he was granted a permanent loan modification. However, Mr. Davis did not realize that the

25

modification granted him was not a HAMP modification after all, but a modification owned or underwritten by Bank of America itself, at the whopping interest rate of 11.9 percent (HAMP modifications result in an interest rate of 2 or 3 percent).

96.    In or around December 2010, approximately the time period in which Mr. Davis' initial HAMP application was rejected by the Bank, Mr. Davis' wife of 15 years, Yamon, told him that she could no longer live under the financial strain and the roller coaster of the modification process and foreclosure threats they were under, and she divorced Mr. Davis.

**E. Plaintiff Burns' Efforts to Obtain a HAMP mortgage modification.**

97.    In 2002, Plaintiff Rhonda Burns refinanced her home with Countrywide (now Bank of America), at the approximate interest rate of 6.25 to 6.75 percent with payments in excess of $1300. At the time, Ms. Burns was married, and had a higher overall household income due to her husband.

98.    Plaintiff and her then husband were divorced in 2005. Because her ex-husband was very undependable and not making child support payments, Plaintiff fell under financial stress and hardship despite holding a full-time job as an Administrative Assistant and Office Manager for an Edward Jones financial planning firm.

99.    Sometime during 2009, Plaintiff learned that President Obama had pushed through relief for homeowners in the form of HAMP mortgage modifications. She called the phone number listed on her mortgage statement from Bank of America and asked for help with a HAMP modification. The Bank of America agent on the call asked her if in the prior six months, a financial catastrophe such as a "job loss" occurred. When she replied, "no," she was told that the HAMP modifications were only for those who had suffered such catastrophic events, and she did not qualify. She was then informed that she might qualify for a non-HAMP modification

26

through Bank of America's own modification products, and she was sent a packet of papers to complete.

100. Plaintiff Burns subsequently completed the packet and sent it to Bank of America as instructed. Sometime later, in response, she was sent an offer of a mortgage modification from Bank of America, but it only reduced her payment by $16 per month, and the offered interest rate was double or triple the 3 percent interest rate effective under HAMP. Ms. Burns rejected the modification offer, due to the high interest rate required in return for only a $16 payment reduction.

101. Ms. Burns did not realize that she had been given false information by the Bank representative in her initial call, and that in fact, she easily would have qualified for a HAMP modification. Indeed, at that time, her income was $42,000 per month. Using the HAMP "waterfall" formula (i.e. reduction to 31 percent of her gross monthly income), a HAMP modification would have reduced her payments from approximately $1350 to $1033, a difference of over $300 per month, starting in 2009.

102. Bank of America's denial of a HAMP modification, which Plaintiff qualified for, caused Plaintiff Burns to continue in financial distress, and caused Plaintiff to fall behind in her mortgage payments from time to time, thereby incurring penalties and late fees. The addition of these fees and penalties were taken out of her subsequent monthly payments, thereby diluting and/or diverting said payments and causing her to appear even further behind. Eventually, Bank of America sued Ms. Burns for foreclosure in 2012. Ms. Burns suffered through that nightmare, finally scraping together enough money to prevent the actual sale of her home.

103. Bank of America's denial of a HAMP modification to Plaintiff Burns caused her to suffer enormous financial losses and emotional stress as she struggled to meet her payment

obligations and struggled with the stress of the eventual foreclosure lawsuit. In addition, the foreclosure lawsuit resulted in unjust and inappropriate penalties, all of which ultimately increased the principal balance of her mortgage. All of this would have been prevented had Bank of America followed its obligation as it agreed when it accepted TARP money from the government, and agreed to perform HAMP modifications in a legal and efficient manner.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

104. Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

105. Plaintiffs bring this action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and a Class consisting of:

- All individuals Kansas homeowners (or former homeowners) whose mortgages have been serviced by one or both Defendants; and

- who have requested or been otherwise eligible for a modification under the terms of HAMP Program Documentation; and

- whose loan Bank of American has not permanently modified either because:

  o Bank of America has not offered them a TTP; or

  o Bank of American denied them a permanent loan modification after they complied with all required obligations under HAMP, as conveyed to them by Bank of America.

106. Excluded from the Class are governmental entities, Defendants, their affiliates and subsidiaries, Defendants' current or former employees, officers, directors, agents, representatives, their family members, and members of this Court and its staff.

107. Plaintiffs do not know the exact size or identities of the members of the proposed class, since such information is in the exclusive control of Defendants. Plaintiffs believe that the

Class encompasses many hundreds and perhaps thousands of individuals whose identities can be readily ascertained from Defendants' books and records. Therefore, the proposed Class is so numerous that joinder of all members is impracticable.

108.    Based on the size of the modifications at issue, Plaintiffs believe the amount in controversy exceeds $5 million.

109.    All members of the Class have been subject to and affected by the same conduct. The claims are based on the terms of a single unifying contract between Bank of America and Fannie Mae, acting as agent for the United States Treasury, and on form contracts and uniform loan modification processing requirements. There are questions of law and fact that are common to the class, and predominate over any questions affecting only individual member of the Class. These questions include, but are not limited to the following:

   a. The nature, scope and operation of Bank of America's obligations to homeowners under HAMP;

   b. Whether Bank of America breached its duties under HAMP that were intended for the benefit of Plaintiff and members of the Class;

   c. Whether the manner in which Bank of America has executed the duties it undertook as part of the HAMP program violates its duty of good faith and fair dealing;

   d. Whether Bank of America's receipt of an executed loan modification agreement, along with supporting documentation and three monthly payments, creates a binding contract or otherwise legally obligates Bank of America to offer Plaintiff and members of the Class a permanent HAMP modification;

e. Whether Bank of America's failure to provide permanent HAMP modification in these circumstances amounts to a breach of contract and/or a breach of the covenant of good faith and fair dealing;

f. Whether Bank of America demanded and collected initial payments from eligible homeowners in violation of HAMP provisions;

g. Whether Bank of America's credit reporting practices violated one or more provisions of HAMP;

h. Whether Bank of America's credit reporting practices violated one or more provisions of the Fair Credit Reporting Act;

i. Whether Bank of America's debt collection practices violated one or more provisions of the Fair Debt Collection Practices Act;

j. Whether Bank of American's written representations to homeowners stating that they would receive permanent loan modifications upon successful completion of the trial period and then failing to provide such permanent modification constitutes an unfair or deceptive practice under the Kansas Consumer Protection Act, K.S.A. 50-623;

k. Whether the above practices caused Plaintiff and members of the Class to suffer injury; and,

l. The proper measure of damages and the appropriate injunctive relief.

110. The claims of the individual named Plaintiffs are typical of the claims of the Class and do not conflict with the interests of any other members of the Class in that Plaintiffs and the other members of the Class were subject to the same conduct, were subject to the terms of the same agreement and were met with the same absence or extended delay of a permanent HAMP modification.

111. The individual named Plaintiffs will fairly and adequately represent the interests of the Class. Each is committed to the vigorous prosecution of the Class's claims and has retained attorneys who are qualified to pursue this litigation, and who have just concluded other wrongful foreclosure litigation against Bank of America, as a result of which said Counsel is intimately familiar with Bank of America's substandard processes and failed systems, the laws and regulations governing Bank of America's processes and mortgage processing systems, the directives and oversight of the U.S. Treasury Department, acting through the Office of the Comptroller of the Currency, and its attempts to reign in Bank of America's substandard processes, procedures, and other intentional systemic failures which will be at the heart of this case, and said Counsel has established relationships with the former employees who will be key witnesses to what appear to be intentional and widespread personnel and systemic failures, as such failures were the very tools used to perpetuate the wrongful conduct described above, all of which has resulted in devastating the lives of thousands of hard working and bill paying Americans who were the very persons HAMP was enacted to protect.

112. A class action is superior to other methods for the fair and efficient adjudication of this controversy. A class action regarding the issues in this case does not create any problems of manageability.

113. This putative class action meets the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3). Bank of America has acted or refused to act on grounds that apply generally to the Class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

31

## COUNT I:
## VIOLATION OF RACKETEER INFLUENCED
## AND CORRUPT ORGANIZATIONS ACT (RICO), 18 U.S.C. §1962(C)

114.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

115.   From at least May 1, 2009, to the present, the affiliation between Bank of America and the other Defendants constituted an enterprise. Defendants conducted and participated in that enterprise's affairs through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 (c), and all as described above.

116.   The RICO enterprise, which engaged in, and whose activities affected interstate and foreign commerce, was comprised of an association-in-fact of entities and individuals that included each and all of the named Defendants.

117.   The members of the RICO enterprise all had a common purpose: to extend as few permanent HAMP modifications as possible while providing Bank of America with a justification to claim that borrowers had not fulfilled their trial-payment agreements or were otherwise ineligible for HAMP modifications.

118.   The enterprise was also forged by the relationships among those associated with it all as described above.

119.   This RICO enterprise has remained in existence for several years, enabling its members to pursue and improperly profit from the enterprise's purpose, all at the expense of homeowners, the federal government through home loan insurance programs, and, ultimately, American taxpayers in general. This enterprise continues today through the present and has consisted of hundreds of thousands (or millions) of acts of mail fraud under 18 U.S.C. § 1341 and

32

wire fraud under 18 U.S.C. § 1343.

120.    The Defendants engaged in a scheme or artifice to defraud borrowers by stalling and hindering the loan modification process and misleading the borrowers to prevent many of the homeowners who are eligible for permanent loan modifications and/or who have met the requirements for participation in HAMP from receiving the loan modifications to which they are entitled.

121.    Bank of America and the other Defendants were aware of this scheme and actively participated in it by all of the manners described above and as will be revealed more fully through discovery.

122.    The U.S. mail or wire services, including internet, telephone and email were used in furtherance of the scheme. Use of the mail or wire services were either known to Bank of America and the other Defendants or it was reasonably foreseeable to them that they would be used for this purpose.

123.    Defendants' repeated violations of the federal mail and wire fraud statutes, which have all occurred in the last few years, include:

a.  Providing instructions over the internet as to the steps a homeowner would need to take to secure a permanent loan modification under HAMP with the knowledge and intent that it would induce homeowners to act in expectation, even though Defendants did not intend to follow the steps stated on their website that would enable homeowners who fulfilled all requirements to obtain a permanent HAMP loan modification.

b.  Sending instructions to Plaintiffs and other homeowners by mail, fax, email or internet directing them to provide documents and other information to be considered for a HAMP loan modification, with the knowledge and intent that it would induce

33

homeowners to act in expectation, even though Defendants did not intend to enable homeowners who fulfilled all requirements to obtain a permanent HAMP loan modification.

c. Providing Trial Period Plans to Plaintiffs and other homeowners by mail, email or internet, which purported to offer permanent modifications in 4 months if certain terms were meant, with the knowledge and intent that it would induce homeowners to act in expectation, even though Defendants did not intend to perform the contracts as promised, and that only a small percentage of homeowners would receive permanent modifications as represented in the Trial Period Plan Agreements.

d. Informing thousands of homeowners by mail, fax, telephone and/or email that their applications were on hold, or that they would not receive a permanent modification, because they had not provided necessary financial documents, when in fact Defendants knew that the homeowners had provided the documents.

e. Informing thousands of homeowners by mail, fax, telephone and/or email that their applications were on hold, or that they would not receive a permanent modification, because their financial information was not timely, even though Defendants knew that the documents were timely when the homeowners provided them.

f. Intentionally providing thousands of homeowners who applied for HAMP loan modifications, and who were qualified to receive HAMP modifications, with in-house loan modifications that were less advantageous to homeowners but more profitable to Bank of America.

124.    The scheme to defraud that was perpetrated by the Defendants and their employees and which was at the center of the racketeering activity, involved issuing trial-payment agreements

34

to thousands of eligible applicants, when Bank of America intended to deny the vast majority of those agreements on entirely false grounds.

125.    As part of and in furtherance of the scheme to defraud, Bank of America and the other Defendants would receive documents and information by mail, fax, telephone and/or email from homeowners fulfilling their Trial Period Plan Agreements and intentionally delay acting on the documents for several months.

126.    As part of and in furtherance of the scheme to defraud, Bank of America and the other Defendants would receive documents and information by mail, fax, telephone and/or email from homeowners and intentionally fail to record receipt of the documents on electronic systems or to convey the modification package to underwriting for months and often not until the documents had aged beyond the point that they could be used for underwriting.

127.    As part and in furtherance of the scheme to defraud, Bank of America and the other Defendants intentionally manipulated and falsified data on customers' electronic files so that files could be closed and modification applications rejected.

128.    As part of and in furtherance of the scheme to defraud, Bank of America and the other Defendants would send borrowers' notices by mail, fax, telephone and/or email that information or documentation was missing from the homeowners' modification files when Bank of America and the other Defendants knew that the homeowners had provided the information.

129.    As part of and in furtherance of the scheme to defraud, Bank of America and the other Defendants regularly sent customers notices of denial by mail, fax, telephone and/or email that the Bank and the other Defendants knew to be based on reasons that were untrue.

130.    As part of and in furtherance of the scheme to defraud, Defendants' various employees falsely held themselves out to Bank of America customers and to the public by mail, fax,

35

telephone and/or email as being employees of Bank of America and gave homeowners the false impression that they were speaking to and corresponding with Bank of America when in fact they were temp workers hired by Disys and Adecco.

131.   These thousands of violations constitute a pattern of racketeering. They are related in that they share the same purpose of defrauding homeowners, involve the same participants, victims, and methods of commission. And because defendants' large-scale criminal activities occurred over a period of several years and are continuing unabated, they amount to or pose a threat of continued criminal activity.

132.   Each of the defendants associated with the RICO enterprise knew of existence of the enterprise and its related activities.   Bank of America, through its designated officers and employees, devised the loan-modification scheme and coordinated with Adecco and Disys to carry it out.   Various employees of all Defendants were instructed and endeavored to employ unscrupulous methods to reduce the number of borrowers who would be granted loan modifications and reprimanding those employees who objected.

133.   Defendants' employees conducted and participated in the affairs of the RICO enterprise through a pattern of racketeering activity.   Each of the Defendants participated in the enterprise's decision-making or were plainly integral to carrying out the scheme to defraud in the specific manners described above.

134.   As part of their participation, each of Defendants, through their employees, knowingly and intentionally sent, mailed, and transmitted or caused to be sent, mailed, or transmitted fraudulent solicitations, instructions, rejections, and Trial Period Plan Agreements in interstate or foreign commerce. These fraudulent documents constituted numerous and repeated violations of the federal mail and wire fraud statutes in violation of 18 U.S.C. §§ 1341, 1343, as

36

well as a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961 (1), 1962 (c). Defendants knew, or at a minimum were reckless in not knowing, that the documents were misleading, deceptive, and/or false when sent, as a result of the actions of their officers and employees pursuant to the loan-modification scheme outlined in this Complaint.

135. In addition, Bank of America, Disys, and Adecco sent, mailed and transmitted or caused to be sent, mailed or transmitted, in interstate or foreign commerce, notices containing false and fraudulent information pertaining to the status of borrowers' efforts to obtain a permanent loan modification under HAMP (or otherwise) to Plaintiffs and to thousands of members of the Kansas RICO Class. These fraudulent notices constituted numerous and repeated violations of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, as well as a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(1), 1962 (c).

136. By reason of their conduct and participation in the racketeering activity, Defendants caused damages to Plaintiffs and to members of the Kansas RICO Class as described below.

## COUNT II:
## BREACH OF CONTRACT/
## BREACH OF DUTY OF GOOD FAITH
## AND FAIR DEALING

137. Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

138. Each named Plaintiff brings this claim on his/her own behalf and on behalf of each member of the Class described above.

139. The Servicer Participation Agreement ("SPA") with the United States Government and the explicitly incorporated Program Documentation constitute a contract for which Plaintiffs and the Class are intended beneficiaries, and under which Bank of America has undertaken duties to act for the benefit of Plaintiffs and the Class.

37

140. By entering into the SPA and accepting valuable consideration including $25 billion in funds from the U.S. Treasury, Bank of America covenanted, on behalf of itself and its subsidiaries, to discharge and administer its contractual obligations with principles of good faith and fair dealing.

141. Bank of America has breached its contractual duties by failing to provide eligible borrowers with the opportunity to accept permanent loan modifications.

142. In addition to duties to Plaintiffs based on their status as third-party beneficiaries of the SPA, Bank of America entered into individual contracts directly with Plaintiffs.

143. The Agreement sent by Bank of America to Plaintiffs constitutes a valid offer.

144. By executing the Agreement and returning it to Bank of America, along with the supporting documentation, Plaintiffs accepted Bank of America's offer.

145. Alternatively, Plaintiff Davis' return of the third Agreement constitutes an Offer to accept a HAMP modification. Acceptance of this offer occurred when Bank of America accepted Plaintiff Davis' three TPP payments.

146. Plaintiff Davis' TPP payments to Bank of America constituted consideration.

147. Plaintiff Davis and Bank of America thereby formed a valid contract.

148. To the extent that the contracts were subject to a condition subsequent providing Bank of America an opportunity to review the documentation submitted by Plaintiff when he returned the signed TPP, this condition was waived by Bank of America and/or it is estopped to assert it as a defense to Plaintiff's claims.

149. By failing three times to grant Plaintiff Davis permanent HAMP modification, Bank of America breached those contracts.

38

150. In addition, Bank of America routinely and regularly breaches its duties under both the SPA and its contracts with individual Plaintiffs by failing to retain, employ, and supervise adequately trained staff; by instituting and/or continuing with foreclosure proceedings against borrowers in a trial program; by failing to provide written notices required by HAMP; by deliberately acting to delay and otherwise frustrate loan modification processes; routinely demanding information already in its files; by making inaccurate calculations and determinations of Plaintiffs' eligibility for HAMP; and by failing to follow through on written and implied promises.

151. Plaintiff Davis remains ready, willing, and able to perform under the contract(s) by making the HAMP modified payments which should have been calculated as part of a permanent modification, as well as by providing any documentation deemed necessary under the terms of HAMP.

152. Plaintiff Davis has suffered harm and is threatened with additional harm from Bank of America's breach. By making three separate modification applications, and finally three TPP payments both during and after the initial three month period of the third modification process, Plaintiff forwent other remedies that he might have pursued in order to reduce the likelihood of default and, correspondingly, to protect his home from further threat of foreclosure. Plaintiff also suffered harm by being forced to pay the alleged arrears in order to save his home, and by being bootstrapped into a non-HAMP modification with the outrageous interest rate of 11.9 percent. On information and belief, some putative Class members have suffered additional harm in the form of foreclosure activity against their homes, similar to the foreclosure action which was pending (but ultimately dismissed by the Bank) against Plaintiff's home.

## COUNT III:
## PROMISSORY ESTOPPEL, IN THE ALTERNATIVE

153. Plaintiff Aloysius Davis repeats and re-alleges every allegation above as if set forth herein in full.

154. Plaintiff brings this claim on his own behalf and on behalf on each member of the Class described above.

155. Bank of America, by way of its TPP Agreements, made a representation to Plaintiff that if he returned the TPP Agreement executed and with supporting documentation, and made his TPP payments, he would receive a permanent HAMP modification.

156. Bank of America's TPP Agreement was intended to induce Plaintiff to rely on it and make monthly TPP payments.

157. Plaintiff did indeed rely on Bank of America's representation, by submitting three separate modification application packets, and by ultimately submitting three trial period payments.

158. Given the language in the TPP Agreement and in each of the three modification packets given to Plaintiff to complete and submit, Plaintiff's reliance was reasonable.

159. Plaintiff's reliance was to his economic detriment.

## COUNT IV:
## ACTION FOR RECOVERY OF MONEY UNDER K.S.A. 50-623
## KANSAS CONSUMER PROTECTION ACT

160. Plaintiffs hereby incorporate by reference each and every allegation contained in the paragraphs as if fully rewritten herein.

161. Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

162. The conduct of Bank of America as set forth herein constitutes unfair or deceptive acts or practices, including its practice of leading borrowers to believe that it will permanently

40

modify their mortgage loans upon successful completion of a TPP, and the illegal collection of upfront fees.

163.    Bank of America's conduct as set forth herein occurred in the course of trade or commerce.

164.    Under Kansas' Consumer Protection Act, unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

165.    As a direct and proximate result of Bank of America's unfair, false, misleading and deceptive conduct, Plaintiffs and Class members have suffered damages in an amount to be proved at trial.

166.    Bank of America acted intentionally with actual malice or with reckless disregard for the rights of Plaintiffs and Class members, thereby entitling Plaintiff and Plaintiff's Class Members to recover punitive damages, compensatory damages, attorneys' fees, costs, pre- and post-judgment interest.

## COUNT V:
## NEGLIGENT MISREPRESENTATION AND
## NEGLIGENT SERVICING

167.    The preceding paragraphs in this Complaint are incorporated by reference as if fully set forth herein.

168.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

169.    Defendants owed Plaintiffs a duty of reasonable professional care in administering the HAMP program.

170.    The Defendants accepted mortgage modification applications and made representations to the Plaintiffs that were false in nature. By failing to administer reasonable

41

loan modifications in a timely manner, Bank of America needlessly, recklessly, and maliciously inflated the Plaintiffs' fees and damaged their credit.

171.    Plaintiffs relied upon the material misrepresentations of the Bank of America and their agents and subsequently applied for mortgage modifications in a Bank of America administered program that was flawed from the inception.

172.    Bank of America, either directly or through its agents, provided false information that misguided the Plaintiffs, resulting in pecuniary loss, further financial debt and damages to the Plaintiffs.

173.    Bank of America owed the Plaintiff a duty of reasonable care and competence in obtaining the proper rate information and then communicating that information to the Plaintiff. Bank of America failed in this duty, even when there was a federal mandate to keep homeowners in their residences.

174.    Bank of America's conduct was negligent and constituted the proximate cause of identifiable damages sustained by Plaintiff and Class members.

175.    Plaintiff and Class members are entitled to compensation, pre- and post-judgment interest, attorneys' fees and costs.

## COUNT VI:
## UNJUST ENRICHMENT

176.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

177.     Plaintiffs bring this claim on his own behalf and on behalf of each member of the Class described herein.

178.     Plaintiffs and the Class conferred a benefit upon Defendants by paying for loan modification services, which provided Defendants with a stream of revenue from the provision of their services.

179.     By concealing from customers that Defendants were not adhering to the contractual obligations they undertook in accepting $25 billion from the United States government to implement and administer the HAMP program, the Defendants failed to provide the loan modification service they purported to provide, thereby making the retention of the financial benefit conferred by Plaintiffs and the Class unjust.

180.     Defendants, through their employees, agents, and representatives, have engaged in acts, methods or practices of deception, fraud, false pretense, false promise, misrepresentation, unfair practice or concealment, suppression or omission of facts in connection with providing loan modification services including, among other things:

   a.  Concealing from customers that Defendants were not adhering to the contractual obligations they undertook in accepting $25  billion dollars from the United States government to implements and administer the HAMP program;

   b.  Routinely failing to meet their obligations under their agreements to provide loan modification services;

c. Routinely forcing mortgage borrowers who request to be evaluated for a modification to face unexplained delays and go weeks or months with no communication from Bank of America after providing the requested information;

d. Routinely forcing borrowers who attempt to contact Bank of America by telephone to face long periods of time on hold and be transferred between service representatives in a deliberate effort to cause the borrower to give up and to terminate the call;

e. Regularly falsely informing borrowers that Bank of America did not receive requested information and demanding that documents be re-sent; and

f. Routinely and serially stringing out, delaying, and otherwise hindering the loan modification processes that Bank of America contractually undertook to facilitate when it accepted $25 billion dollars from the United States.

181. Nevertheless, Defendants appreciated and retained the benefits conferred by Plaintiffs and the Class, which is unjust, unfair, and inequitable, in the circumstances described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, each on his/her own behalf and on behalf of the other members of the Class, request Judgment and relief on all causes of action as follows:

1. An order from this Court certifying this action as a class action under Kansas Rules of Civil Procedure, and appointing Plaintiff as representative of the Plaintiffs' Class described herein;

2. Judgment in favor of Plaintiffs and Class members against Bank of America, jointly and severally, in an amount to be ascertained at trial and that includes monies paid to

44

Defendant(s) by Plaintiff and Class members for excessive fees paid as a result of the wrongful acts set forth above;

3.    Judgment in favor of Plaintiffs and Class members and against Defendants, jointly and severally, awarding Plaintiff and Class members pre- judgment and post judgment interest to compensate them for Defendants' wrongful use of Plaintiff's and Class members' money;

4.    Judgment in favor of Plaintiffs and Class members and against Defendants, jointly and severally, awarding Plaintiffs' and Class members' attorneys' fees, Class Representative incentive fees, litigation expenses, including fees and costs of expert witnesses, and all other costs of this action;

5.    Judgment declaring the acts and practices of Defendants complained of herein to constitute fraud, together with an award of monetary damages and other available relief on those claims to Plaintiffs and Class members;

6.    Treble damages and the cost of the suit, including attorneys' fees, pursuant to 18 U.S.C. § 1964(c);

7.    A permanent or final injunction enjoining Bank of America's agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiff and the members of the Class;

8.    Order Bank of America to adopt and enforce a policy that requires appropriate training of their employees and agents regarding their duties under HAMP;

9.    Order specific performance of Bank of America's contractual obligations together with other relief required by contract and law;

10.   That the undersigned counsel be appointed as Class Counsel;

11.     Judgment in favor of Plaintiffs and Class members and against Defendants, jointly and severally,  awarding Plaintiffs and Class members such other and additional legal or equitable relief as may be just and warranted under the circumstances.

### JURY DEMAND

Plaintiffs demand a trial by jury on all issues that may be so tried.

Respectfully submitted,

Dickens Law LLC

*/s/ Linda S. Dickens*

Linda S. Dickens (25131)
KS Sup. Ct. 25131
27 Corporate Woods
Suite 190
10975 Grandview Street
Overland Park, KS  66223
(913) 562-1165
(913) 486-9908
(913) 317-1416
Linda@DickensLawKC.com